Filed 5/30/19 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>   v.<br><br>ALLEN BOCTEEMUS FRANKS,<br><br>        Defendant and Appellant. | C085073<br><br>(Super. Ct. No. 15F01671)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on May 29, 2019, was certified for partial publication in the Official Reports. For good cause it now appears that the opinion should be published in full in the Official Reports and it is so ordered. There is no change in the judgment.

1

FOR THE COURT:


     RAYE     , P. J.


     ROBIE     , J.


     KRAUSE     , J.

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ALLEN BOCTEEMUS FRANKS,<br><br>        Defendant and Appellant. | C085073<br><br>(Super. Ct. No. 15F01671) |

APPEAL from a judgment of the Superior Court of Sacramento County, Raoul M. Thorbourne, Judge.  Remanded and affirmed as modified.

Law Office of Lichstein & Plummer and Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Allen Bocteemus Franks killed his girlfriend, Kimberly C.  On appeal, defendant contends that his conviction for voluntary manslaughter must be overturned

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III.

1

due to his counsel's implicit concession during closing argument that defendant killed the victim. He also challenges a $400 fine imposed by the trial court. In supplemental briefing, defendant asks that we remand the case to permit the trial court to consider whether to exercise its discretion and strike his prior serious felony enhancement, pursuant to Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1-2). We will affirm the judgment and remand the matter for a new restitution hearing.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The instant offense*

Defendant and the victim began dating in November 2014. During their relationship, the victim was arrested for domestic violence against defendant. The victim also had obtained a restraining order against defendant. Due to another domestic violence incident between the victim and defendant in February 2015, the victim was concurrently fighting with her ex-boyfriend for custody of their daughter.

At 1:45 p.m. on March 16, 2015, the victim's mother received an "S.O.S." message from the victim's phone. The victim did not answer when her mother called, so the mother, her husband, and granddaughter drove to the victim's condominium. No one answered the front door, so the mother tried to peer into a fenced-in backyard patio area. From behind the fence, a man told the mother he was there alone to fix a toilet. He identified himself as the victim's ex-boyfriend, but the mother did not believe him because his voice was different. The man agreed to open the front door, but instead fled in the victim's minivan. The victim's family found her dead inside the condo.

The victim died due to asphyxia by strangulation and blunt force injuries. Defendant's DNA was found underneath the victim's fingernails and on a blood smear on a curtain in the condo.

The day after the murder, police found defendant in the victim's van. After his arrest, he declined to provide a blood sample, saying "he was not going to give [police] anything that would send him to [his] death." He also refused to sign a form regarding

2

the questions that officers had asked him. Defendant said that the officers had "only asked me questions about the person that I killed."

During a subsequent police interview, defendant denied harming the victim. He said he would "let her beat . . . me before I would ever put my hands on her." Defendant explained he had been at the victim's condo the day before the murder, and they had argued and gotten into "little grabbing matches." Defendant said he had tried to restrain the victim while she scratched and hit him. The police officers described defendant as having "marks all over." Defendant told the officers that he was still in the victim's condo the morning of the murder, but he left in the victim's car to purchase cigarettes. When the police told defendant the victim had died, he denied hurting her. A video of defendant's interview was shown to the jury.

### 2. *Pretrial proceedings*

#### A. *Marsden* and other pretrial proceedings

Before trial, the court held four hearings and denied defendant's repeated requests for new counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). During these hearings, defendant complained about lack of communication with his counsel, his access to discovery, counsel "scaring" his family by telling them he faced a long sentence, counsel failing to object to his fingerprinting after the preliminary hearing, his access to the jail's law library, and counsel delaying hearings. Defendant also complained he was visually impaired and required special accommodations to read the discovery.

During the December 2, 2015 hearing, counsel stated that he had tried to explain what was going on, but defendant "never wanted to enter into any conversation." During the August 2016 hearing, defendant said he wanted to see the discovery so he could "help [his lawyer] fight" the prosecution's evidence.

During the March 2017 hearing, defendant complained that his lawyer was not communicating with him about the facts of the case and said he wanted an attorney who was "seriously looking at the circumstances surrounding this case." According to

3

defendant, there were "several conflicting statements that really needed to be addressed." Defendant complained that even though counsel had represented him for over two and a half years, he had visited him only six times. Frustrated that counsel chose to communicate with him primarily via mail, defendant refused to accept his attorney's letters.

Defense counsel told the court that defendant refused to discuss anything except the accommodations he needed for his visual impairment. According to counsel, he had "received no attorney-client confidential information from [defendant]" and defendant "never discussed the facts of this case" with him. Counsel assured the court that he was familiar with the facts of the case and asked that defendant "simply cooperate with [him] and communicate with [him] about the case." In denying the *Marsden* motion, the trial court noted defendant had been "disruptive" and "not cooperative" with his counsel; defendant "refuse[d] to talk to [defense counsel] about the case" and rejected counsel's correspondence.

Defendant complained about access to discovery again during pretrial proceedings in March and May 2017. He also asserted that the DNA evidence against him was not credible. Defendant refused to come to court for hearings in March, June, October, and December 2016, and January and May 2017. Defendant was removed from the courtroom for being disruptive in August and May 2017.

### B. Competency proceedings

Before trial, two physicians and one psychologist evaluated defendant's competence to stand trial pursuant to Penal Code section 1369.[1] Each evaluator found defendant competent. One evaluator noted in her October 2015 report that defendant "refuses to communicate with his attorney regarding matters pertaining to this case."

---

[1] Undesignated statutory references are to the Penal Code.

A second evaluator noted in his May 2016 report that defendant told the evaluator that the evidence against him was " 'bull[].' " A third evaluator noted in her June 2016 report that defendant was "deliberately refus[ing] to collaborate with his attorney" so as to have his lawyer replaced.

### 3. *Trial and sentencing*

On the first day of trial, which ran from May through June of 2017, defendant became disruptive and voluntarily absented himself from the proceedings. Although defendant appeared near the close of the prosecution's case to confirm that he did not want to testify, he otherwise was voluntarily absent from trial.

During closing argument, defense counsel conceded that defendant was with the victim when she was injured and was the man with whom the victim's mother spoke just before finding the victim's body. But, he argued, the real issue was "what happened in the house between [the victim] and [defendant]." Counsel described the victim's relationship with defendant as "tumultuous" and "unhealthy." He noted the victim was "battling for [custody of] her daughter" with her ex-boyfriend because of her relationship with defendant. Consequently, counsel argued, the victim had "a great deal of emotional issues . . . on her plate," when she scratched and injured defendant. Although defendant's injuries were not life threatening, it was reasonable for defendant to have a "physical response." Counsel also suggested that the victim may have been injured while defendant was restraining her in an effort to stop her from scratching him. He encouraged the jury to "read through" the law of involuntary manslaughter.

The jury ultimately found defendant guilty of voluntary manslaughter. (§ 192, subd. (a).) In bifurcated proceedings, the jury also found true the allegation that defendant had a prior strike.

During the July 2017 sentencing hearing, the trial court considered defendant's motion to strike his strike pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. Even though the motion was "not frivolous," the trial court denied it.

5

The trial court reasoned defendant was not outside the spirit of the three strikes law due to his "extensive" criminal history, as well as his background, circumstances, and conduct in the instant offenses. The trial court continued: "And also, by the way, I will not exercise my discretion, which I might have, to strike the punishment of either the strike prior or the 667(a) five-year prior that is to be imposed in this case." The probation officer noted in the probation report that defendant told the probation officer he did not kill the victim.

The trial court sentenced defendant to state prison for an aggregate term of 27 years, as follows: the upper term of 11 years for the voluntary manslaughter charge (§§ 192, subd. (a), 193, subd. (a)), doubled to 22 years due to the prior strike (§ 667, subds. (b)-(i)), plus five years for the prior serious felony conviction (§ 667, subd. (a)). In selecting the upper term, the trial court found the aggravating factors "greatly outweigh[ed]" the mitigating factors, including that the crime involved "great violence" and defendant had an "extensive" criminal record.

The court also imposed various fines and fees, including a $400 restitution fine (§ 1202.4, subd. (b)) and a $400 parole revocation fine, suspended unless parole was revoked (§ 1202.45). With respect to compensation for the victim's family, the trial court noted that the probation report listed $20,549, plus an additional amount to be determined. Defense counsel argued the supporting documentation was insufficient, and the court agreed to hold a hearing regarding "specific amounts." Citing section 2085.5, the trial court also ordered defendant to pay $400 to the California Victim Compensation Board's restitution fund.

After filing his appeal, defendant filed a motion in the trial court requesting the $400 payment to the California Victim Compensation Board's restitution fund be stricken. The trial court denied defendant's motion, reasoning that it lacked jurisdiction due to defendant's pending appeal. Regardless, the court found that the sum was properly imposed under section 1202.4 as victim restitution. The court explained that it

6

had ordered the payment to "reimburse the [California Victim Compensation Board's restitution fund] for monies the fund had already paid the victim(s) directly."

DISCUSSION

I

Citing *McCoy v. Louisiana* (2018) 584 U.S. ___ [200 L.Ed.2d 821] (*McCoy*), defendant argues that his Sixth Amendment right to maintain innocence as the fundamental objective of his defense was violated by his counsel's implicit concession during closing argument that defendant killed the victim. According to defendant, various statements he made during the case suggested he wanted to maintain his innocence. For instance, he notes that he repeatedly denied killing the victim during his police interview. He also points to his repeated requests to review discovery and his comment that he wanted to "help [his lawyer] fight" the charges against him. Defendant asked that his counsel "seriously look[] at the circumstances surrounding this case," including "conflicting statements," DNA evidence, and other discovery. Defendant also told one of the competency evaluators that the evidence against him was " 'bull[].' " Defendant further notes that, after the jury verdict, he told a probation officer that he did not kill the victim. Finally, defendant maintains that he never gave his counsel cause to believe he had "changed his position on whether he wanted to admit he killed the victim," given that he never talked about the case with his counsel.

As explained in *McCoy*, when a lawyer is "[p]resented with express statements of the client's will to maintain innocence, . . . counsel may not steer the ship the other way." (*McCoy, supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 832].) In *McCoy*, the defendant was convicted of three counts of first degree murder and sentenced to death. (*Id.* at p. ___ [200 L.Ed.2d at p. 829].) Throughout the proceedings, the defendant "insisted" he was innocent. (*Id.* at p. ___ [200 L.Ed.2d at p. 827].) When defense counsel informed the defendant before trial that he would try to avoid a death sentence by conceding that the defendant had committed the murders, the defendant was " 'furious' " and explicitly

7

instructed his counsel not to make the concession. (*Id.* at p. ___ [200 L.Ed.2d at p. 828].) The trial court denied the defendant's request for new counsel. (*Ibid.*) Despite the defendant's testimony that he was innocent, during opening and closing argument, defense counsel conceded defendant killed the victims (*id.* at pp. ___ [200 L.Ed.2d at pp. 828-829]), but argued he did not commit first degree murder (*id.* at p. ___ [200 L.Ed.2d at p. 835] (dis. opn. of Alito, J.)). The jury returned three death verdicts. (*Id.* at p. ___ [200 L.Ed.2d at p. 829].)

The trial court in *McCoy* denied the defendant's subsequent motion for a new trial, reasoning that, despite the defendant's opposition, defense counsel had authority to concede guilt because it was reasonable to believe that this strategy presented the best chance to avoid a death sentence. (*McCoy, supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 829].) The Supreme Court reversed, holding that it violated the Sixth Amendment to "allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." (*Id.* at pp. ___, ___ [200 L.Ed.2d at pp. 829, 834].) The court reasoned that while "[t]rial management is the lawyer's province," including decisions as to " 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence,' " a criminal defendant is entitled to "[a]utonomy to decide that the objective of the defense is to assert innocence" and to "insist on maintaining her innocence at the guilt phase of a capital trial." (*Id.* at p. ___ [200 L.Ed.2d at p. 830].)

Similar issues were considered in *Florida v. Nixon* (2004) 543 U.S. 175 [160 L.Ed.2d 565] (*Nixon*), in which defense counsel conceded during trial that the defendant killed the victim in an effort to obtain leniency during sentencing. (*Id.* at pp. 180-180.) Unlike the defendant in *McCoy*, however, the defendant in *Nixon* "was generally unresponsive" during discussions of trial strategy with his lawyer, and "never verbally approved or protested" the proposed strategy. (*Nixon*, at p. 181.) On appeal, defendant argued his counsel had provided ineffective assistance in conceding his guilt

8

without his explicit consent.  (*Id.* at p. 185.)  The *Nixon* court disagreed, reasoning that, although defense counsel has a "duty to discuss potential strategies with the defendant," counsel is not "automatically barred" from conceding guilt where the defendant neither consents nor objects.  (*Id.* at p. 178.)

The People argue that *McCoy* is inapplicable because this is not a capital case and because defense counsel did not actually concede that defendant was guilty of any of the crimes charged.  Regardless, we find no merit in defendant's contentions.

Defendant argues in effect that defense counsel should be required to intuit his client's objective at trial based upon statements made, not to his attorney, but to the police, a competency evaluator, and a probation officer.  *McCoy* makes clear, however, that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear *to his counsel*, and counsel must override that objective by conceding guilt.  (*McCoy, supra*, 584 U.S. at pp. ___ [200 L.Ed.2d at pp. 831-832] ["When a client *expressly asserts* that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt" [first italics added]]; see also *People v. Lopez* (2019) 31 Cal.App.5th 55, 66 ["we have found no authority, nor has [the defendant] cited any, allowing extension of *McCoy*'s holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense"]; cf. *People v. Eddy* (2019) 33 Cal.App.5th 472, 481, petn. for review filed May 6, 2019, S255600 [finding Sixth Amendment violation where counsel conceded the defendant's guilt during trial even though the record "establish[ed] that trial counsel knew that defendant did not agree with the strategy of conceding manslaughter in closing argument"].)

Although defendant denied guilt during police interrogations and expressed a general desire to review discovery and help his lawyer "fight" the prosecution's evidence, nothing in the record indicates that he ever made it clear to his counsel (or the court) that

9

the objective of his defense was to maintain innocence, or that he voiced "intransigent objection"—or any opposition—to his lawyer's defense strategy. To the contrary, as in *Nixon*, counsel repeatedly told the court that defendant refused to speak with him about the case during their six meetings.[2] In addition, defendant regularly rejected his counsel's correspondence regarding the case and declined to attend trial.

On this record, we find no violation of the Sixth Amendment right recognized in *McCoy*.

## II

Defendant's sentence includes a five-year prior serious felony enhancement pursuant to section 667, subdivision (a). At the time defendant was sentenced, the court had no discretion to strike such an enhancement. (See former § 667, subd. (a); former § 1385, subd. (b).)

Senate Bill No. 1393 (2017-2018 Reg. Sess.), which went into effect on January 1, 2019, amends sections 667, subdivision (a) and 1385, subdivision (b) to allow a trial court to exercise its discretion to strike or dismiss a prior serious felony allegation for sentencing purposes.

Unless there is evidence to the contrary, it is reasonable to infer that amendments to statutes that either reduce the punishment for a crime or, like Senate Bill No. 1393,

---

[2] As reflected in the record of his *Marsden* hearings and his absence during trial, defendant's relationship with his counsel was strained. Still, defendant does not argue that his trial counsel failed to attempt to consult with him about the trial strategy during these six meetings or in his correspondence. One of counsel's duties, derived from his function as an assistant to the defendant, is "to consult with the defendant on important decisions." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 694].) The record here does not suggest that defense counsel failed in his duties, and in the absence of evidence to the contrary, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 389.) There is no evidence in this case to rebut that presumption, and we will not presume error on appeal. (*People v. Farrara* (1956) 46 Cal.2d 265, 268.)

vest in the trial court the discretion to impose a lesser penalty, apply to all defendants whose judgments are not final as of the amendment's effective date. (*In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972-973.) In fact, the parties concede that the bill applies retrospectively to this case, which is not yet final.

Defendant asks us to remand the matter to allow the trial court to exercise its new discretion and consider striking the prior serious felony enhancement. We conclude that remand would be futile.

Remand is required unless "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] enhancement" even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) In reviewing whether the trial court made such an unequivocal indication, we consider the trial court's statements and sentencing decisions. (See *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [no remand to consider new discretion to strike firearm enhancement where trial court considered mitigating and aggravating factors, made "pointed comments on the record," and selected the "highest possible term" for the firearm enhancement, such that there was "no possibility that, if the case were remanded, the trial court would exercise its discretion to strike the enhancement altogether"]; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [no remand for resentencing where trial court stated that imposing the maximum sentence was appropriate, imposed the upper term, and imposed two additional discretionary one-year enhancements].)

Here, we have a clear indication that the trial court would not exercise its discretion under Senate Bill No. 1393 to strike the prior serious felony enhancement. During the sentencing hearing, the court elected to impose the upper term, finding that the aggravating factors "greatly outweigh[ed]" the mitigating factors, including that the crime involved "great violence" and defendant had an "extensive" criminal history.

11

Beyond that, however, the court stated on the record that it would not have dismissed defendant's prior serious felony even if it had discretion to do so: "And also, by the way, I will not exercise my discretion, which I might have, to strike the punishment of either the strike prior or the 667(a) five-year prior that is to be imposed in this case."[3]  This record affirmatively demonstrates that the trial court was not inclined towards leniency and would not exercise its new discretion to strike defendant's enhancement.  We therefore decline to remand for resentencing under Senate Bill No. 1393.

III

Defendant requests that we strike the court-ordered $400 payment to the California Victim Compensation Board's restitution fund, and we agree.  To the extent the trial court was unclear about the statutory basis for the sum during the July 2017 sentencing hearing, the court's July 2018 order explained it was victim restitution pursuant to section 1202.4.  The court further stated that the sum was imposed to "reimburse the [California Victim Compensation Board's restitution fund] for monies the fund had already paid the victim(s) directly."

It was error for the trial court to impose the $400 sum after expressly reserving determination of the specific amounts of victim restitution based upon defense counsel's objection.  A defendant has a right to a hearing to dispute the determination of the amount of restitution.  (§ 1202.4, subd. (f)(1).)  Moreover, as defense counsel argued during the hearing, there was insufficient documentation to support the $400 figure. (§ 1202.4, subd. (f)(4)(B) [the amount of money paid by the California Victim Compensation Board to victims "shall be established" with certified copies of bills and a statement made under the penalty of perjury by the custodian of records that those bills were submitted to and were paid by the California Victim Compensation Board]; see also

---

[3]  Although the People initially conceded that remand was appropriate, they retracted the concession at oral argument after discovering this statement in the trial record.

*People v. Millard* (2009) 175 Cal.App.4th 7, 26 [there must be " ' " 'a factual and rational basis for the amount of restitution ordered by the trial court' " ' "].)  As such, we will reverse the $400 restitution award against defendant and remand for a new restitution hearing.  (See *People v. Harvest* (2000) 84 Cal.App.4th 641, 650 [victim restitution does not constitute punishment for double jeopardy purposes].)

                                  DISPOSITION

        The matter is remanded to the trial court to conduct a new victim restitution hearing.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                           KRAUSE           , J.



I concur:



        RAYE          , P. J.


                                       13

ROBIE, J., Concurring and Dissenting.

I recognize that the trial judge at sentencing stated "it would not have dismissed defendant's prior serious felony even if it had discretion to do so."

Nevertheless, I have a fundamental disagreement with the majority's conclusion not to remand to the trial court. I do not believe I or any appellate court has the wisdom to determine what the trial judge would have done at a defendant's sentencing hearing *if, in fact, it had been aware of the full extent of its discretion* under Senate Bill No. 1393, effective January 1, 2019. "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*In re Estrada* (1965) 63 Cal.2d 740, 745.)

With the enactment of Senate Bill No. 1393 following defendant's sentencing, the Legislature changed the calculus a trial judge must enter when determining whether a prior conviction enhancement is appropriate. Because of this change, anything the trial judge said at the time of sentencing is tainted by the policy considerations behind the law then in effect. The trial judge's comment at the time of sentencing as to the hypothetical situation of what it would do if it had the authority to strike the prior is necessarily informed by what the judge and the Legislature thought was appropriate under the law at the time. But what was appropriate then may not be what is appropriate now under a law the Legislature amended for being too stringent.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354,

1

1391.)  After taking into account the change in policy and after hearing argument from both sides, the trial court may feel differently than when it initially sentenced defendant to the enhancement.  Defendant should not be denied this opportunity.  Accordingly, I agree with the People and would remand for the trial court to exercise its informed discretion as to whether to strike the prior conviction.  This resolution can be accomplished simply since the majority is remanding anyway for another purpose.


      ROBIE, J.